UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SUSIE CONNER, | Case No. 4:22-cv-11965 |
| *Plaintiff*, | F. Kay Behm |
| v. | United States District Judge |
| CARLETTA McLEOD, STEPHANIE MOSES f/k/a STEPHANIE JACKSON, and ADESOLA BILESANNI, | Patricia T. Morris United States Magistrate Judge |
| *Defendants*. | |
| _____/ | |

**REPORT AND RECOMMENDATION
TO GRANT DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT (ECF No. 31)
AND
DENY PLAINTIFF'S MOTION TO OVERRULE
DEFENDANTS' OBJECTIONS AND COMPEL
DEFENDANTS TO RESPOND AS MOOT (ECF No. 35)**

I. **RECOMMENDATION**

For the following reasons, **IT IS RECOMMENDED** that the Court **GRANT** Defendants' joint motion for summary judgment. (ECF No. 31). If adopted, the Court should **DENY** Plaintiff Susie Conner's motion to overrule Defendants'

objections and compel Defendants to respond **AS MOOT**.[1] (ECF No. 35). Granting the motion for summary judgment would end this case.

## II. REPORT

### A. Introduction

In its August 14, 2023 opinion and order of partial summary dismissal, "the Court conclude[d] that [Conner's] claims against [D]efendants Officer McLeod, RUM [Moses], and PC Bilesan[n]i for the failure to protect and deliberate indifference survive[d] the Court's initial screening under 28 U.S.C. §§ 1915(e)(2)(b) and 1915A. . . ." (ECF No. 6, PageID.248). Before the Court is McLeod, Moses, and Bilesanmi's motion for summary judgment on those claims. (ECF No. 31). The motion is fully briefed (ECF Nos. 37, 39)[2] and ready for

---

[1] In this motion, Conner moves to compel Defendants to respond to interrogatories. (ECF No. 35). For reasons that will be explained in the body of this Report and Recommendation ("R&R"), it is highly unlikely that any additional discovery would affect the recommendation to grant Defendants' motion. Thus, if this R&R is adopted, the motion should be denied as moot. Moreover, Conner did not provide a copy of the relevant interrogatories.as required by Eastern District of Michigan Local Rule 37.2 and her motion is untimely. *See, e.g.*, *McCallum v. Michigan Dep't of Corr.*, No. 17-2042, 2018 WL 4203401, at *2 (6th Cir. May 24, 2018) (holding that a district court did not abuse its discretion when it denied the plaintiff's motion to compel as untimely when it was filed after the close of discovery).

[2] Almost two months after filing her response and about a month after Defendants filed their reply, Conner moved to amend her response to address arguments raised in Defendants' reply. (ECF No. 42). The Undersigned granted the motion in a text-only order and now treats the filing as a sur-reply for the purposes of this Report and Recommendation.

consideration.

### B. Background

In the August 14, 2023 opinion and order of partial summary dismissal, the Court summarized Conner's allegations as follows:

> [Conner] alleges that on August 29, 2019 she reported to her assignment as a Prisoner Observation Aide [("POA")]—a program that monitors other prisoners who are under the care of mental health therapy. [Conner] alleges that during her assignment she observed inmate Sparks-Ross display aggressive and unstable behavior by beating on her cell door and screaming to "let her out." According to [Conner], Officer McLeod unlocked Sparks-Ross's cell door, turned her back, and the walked down the hallway. [Conner] alleges that Officer McLeod was aware of Sparks-Ross's unstable behavior, but did not place Sparks-Ross in restraints. [Conner] alleges that Sparks-Ross exited her cell and immediately assaulted [Conner]. Another Prisoner Observation Aide attempted to assist [Conner] in defending the attack. [Conner] alleges that Officers Kennedy, Maggason, and McLeod ran down the hallway toward [Conner] and Sparks-Ross. Once Sparks-Ross was placed in handcuffs, Lt. Morris, with the assistance of two other officers, escorted Sparks-Ross back to her cell. [Conner] was provided a wheelchair and taken to a medical room where medical staff evaluated her injuries. [Conner] alleges that she sustained numerous lacerations to her face, injury to her left shoulder, and a concussion.
>
> [Conner] submitted a letter requesting that a complaint be filed with the Michigan State Police regarding the assault. According to [Conner], Inspector Nowak informed her that he had filed a report with the Michigan State Police. However, [Conner] alleges that the Michigan State Police provided a letter dated September 19, 2019 that confirmed no record of the assault existed. Plaintiff alleges that defendants Lt. Morris, Assistant Deputy Allen, and Inspector Nowak violated numerous MDOC policy directives and operating procedures by failing to file the report.
>
> [Conner] further alleges that on October 29, 2020, Sparks-Ross was moved to her unit, which placed [Conner] at risk for a second assault

3

and caused her to become more anxious, fearful, and depressed. [Conner] complained that moving Sparks-Ross to her unit was a violation of MDOC policy. However, RUM [Moses] informed [Conner] that Sparks-Ross placement was proper because a Special Problem Offender Notice (SPON)—a notice that would ensure [Conner] was not housed with inmates who pose a genuine threat to her safety—was not issued after the investigation concluded. [Conner] alleges that the failure to issue a SPON violated of MDOC policy and constituted deliberate indifference to her safety. [Conner] alleges that RUM [Moses] acted with deliberate indifference when [s]he placed Sparks-Ross in her unit and refused to move her out. [Conner] further alleges that PC Bilesan[n]i knew that placing Sparks-Ross in [Conner's] unit caused [Conner] increased mental distress, but did not inform RUM [Moses].

(ECF No. 6, PageID.241–42).

In support of their motion for summary judgment, Defendants have submitted declarations from themselves (ECF No. 31-2, 31-3, 31-6), the transcript from Conner's deposition (ECF No. 31-4), and security camera footage of the underlying incident.

At her deposition, Conner testified that a POA from the shift prior to hers "reported that Sparks-Ross had been very agitated, beating on her cell, yelling and screaming [for someone] to let her out" from 3:20 a.m. to 6:35 a.m. that day. (ECF No. 31-4, PageID.482–83). Conner arrived for her shift at approximately 6:45 a.m. (*Id.* at PageID.484). Conner witnessed McLeod being informed of Sparks-Ross' behavior. (*Id.* at PageID.486).

Conner did not have any kind of relationship with McLeod and could not recall ever speaking to her. (*Id.* at PageID.487). There was no reaction when

4

McLeod's cell was unlocked. (*Id.* at PageID.489). Conner explained that she and others around her "did not feel like [Sparks-Ross] was going to do anything to [them]." (*Id.*). They had not done or said anything to Sparks-Ross and were just performing their duties as POAs. (*Id.*).

Conner further testified that on October 29, 2020, Sparks-Ross was moved into her housing unit. (*Id.* at PageID.489–90). Conner saw Sparks-Ross in the unit and other inmates told her that Sparks-Ross was now being housed there. (*Id.* at PageID.490). Conner told Bilesanmi that she had an issue with being housed in the same unit as Sparks-Ross. (*Id.* at PageID.491). Bilesanmi said that there was nothing that she could do and that Conner would need to talk to her superiors. (*Id.*). Conner did not have an opportunity to discuss the issue with Moses until after Conner had been moved to a new unit. (*Id.*).

Conner assumed that Defendants knew Sparks-Ross was a danger to other inmates because it was "a known fact" at the correctional facility that she was "an assaultive person." (*Id.* at PageID.495–97, 501). There were also rumors that Sparks-Ross was refusing medication at the time she assaulted Conner. (*Id.* at PageID.498–99).

In her declaration, McLeod explains that she is a corrections officer and that on the relevant date she was working in the Calhoun Acute Unit, which "is a small housing unit that houses prisoners receiving inpatient mental health treatment. The

5

prisoners housed in that unit are under Mental Health Management Plans, which are put in place by the respective prisoner's Qualified Mental Health Professional (QMHP)." (ECF No. 31-2, PageID.466). A POA's "job is generally to watch prisoners who's QMHP has determined need constant monitoring, such as being determined suicidal. Sparks-Ross did not require such a monitor on August 29, 2019." (*Id.* at PageID.467).

Sparks-Ross' plan on August 29, 2019, allowed her to spend one hour out of her cell and did not require an officer to escort her during her out-of-cell time. (*Id.*). Such an allowance is common for prisoners housed in the unit. (*Id.*). "[T]he procedure is to unlock the prisoner's door, and the prisoner is then free to come and go as they please, such as going to the day room and going back to their cell." (*Id.*). "Prior to unlocking Sparks-Ross' door on the morning of August 29, 2019, there was no indication that she would assault or otherwise harm anyone. Further, [McLeod] had no information that indicated that Sparks-Ross had been refusing medication or acting unusual." (*Id.*).

After Sparks-Ross' cell was unlocked, she assaulted Conner. (*Id.*). "The assault appeared to be completely random and unprovoked." (*Id.*).

McLeod also provided the following summary of the video recording of the assault:

- The video shows a view looking down a cell block in Calhoun Acute with a view towards the officer station. The video starts at

6

> approximately 6:39:59 a.m. Conner (white female with long gray hair in a ponytail, wearing blue long sleeve shirt with orange stripe across shoulders) immediately comes into view walking from the bottom of the screen. She pushes a chair up close to a door with a green sign that says "NON-BOND STATUS USE RESTRAINTS."

- At approximately 6:44:17, another prisoner (black female) retrieves her jacket from a chair. Conner then grabs that chair and moves it next to another POA, prisoner Kathy Phaneuf . . ., and appears to engage in conversation with her.

- At approximately 6:46:02, CO Meggison approaches Conner and Phaneuf and inquires if one of them has to leave their assignment early. Phaneuf responds that she has to leave at 8:30 a.m. CO Meggison then discusses the work schedules further with Conner and Phaneuf. Much of the discussion cannot be heard distinctly, but it is clear that there is no discussion about Sparks-Ross or of any prisoner acting violently. CO Meggison then walks back towards the officer station as she notifies the other officers, including me, that Phaneuf has a mental health meeting at 8:30 a.m.

- At approximately 6:47:15, as she braids her hair, Conner appears to smile and give a friendly wave in the direction of the cell across the hall from her. This is Sparks-Ross cell.

- At approximately 6:48:12, I approach Conner and Phaneuf and tell them how we've decided to work out the issues with their POA work schedules. Again, much of the discussion cannot be heard distinctly, but it is clear that there is no discussion about Sparks-Ross or of any prisoner acting violently. I am standing right next to Spark[s]-Ross' cell during this discussion.

- At approximately 6:48:59, I begin to walk back towards the officer station. A voice then can be heard saying, "Officer Mcleod, can you let me out." This is Sparks-Ross speaking. Sparks-Ross did not yell and there was no anger or animosity in her voice. I respond to Sparks-Ross that we are getting ready to let her out. I then finish walking down to the officer station and briefly discuss the work shifts with the other officers. I also tell the officers that I am going to release Sparks-Ross for her hour out.

- Neither Conner, nor Phaneuf, nor any other officers in the unit, say anything to me after I say that I am getting ready to let Sparks-Ross

7

- out.
- At approximately 6:49:20, I begin to walk back up the hallway towards Sparks-Ross' cell. At approximately 6:49:40, I unlock Sparks-Ross' door and push it open. I then walk back towards the officer station. At no time do either Conner or Phaneuf make any statement to me about Sparks-Ross, much less any concern about her being let out of her cell. Additionally, nothing from Conner or Phaneuf's body language indicates any apprehension from Sparks-Ross being let out of her cell.
- Throughout the video, prior to me unlocking Sparks-Ross door, there is never any noise of someone screaming or banging on a cell.
- At approximately 6:49:50, Sparks-Ross exits her cell and walks in the direction of Conner. Conner appears to smile at Sparks-Ross as she walks towards her. Sparks-Ross then starts punching at Conner. Phaneuf intervenes and Sparks-Ross throws punches at her as well. I, along with the other officers, see the fight and run towards it, and I grab Sparks-Ross in a bear hug approximately seven seconds after the first punch is thrown. Officers Meggison and Kennedy then help restrain Sparks-Ross as Phaneuf tends to Conner. Officer Meggison then tells another prisoner to get a nurse from healthcare for Conner.
- At approximately 6:50:38, CO Peak and Lieutenant Morris arrive as the video ends.

(*Id.* at PageID.468–70).

The Undersigned has watched the recording to ensure that McLeod accurately described it. As McLeod notes, much of the audio is unintelligible; however, to the extent that anything can be heard, it is consistent with McLeod's declaration. The imagery is also consistent.

Moses' declaration focuses on the events following the assault. During the relevant period, Moses was employed as a resident unit manager at the correctional facility. (ECF No. 31-3, PageID.473). She explains that on October 29, 2020,

8

Sparks-Ross was moved into Gladwin Unit—the same unit where Conner was then housed. (*Id.* at PageID.473). Less than two weeks later, Conner was moved to a different unit. (*Id.* at PageID.473–74). Two days later, Sparks-Ross was paroled from MDOC custody. (*Id.* at PageID.474).

Moses says that she "regularly made rounds through Gladwin Unit[,]" but that "Conner never communicated to [her] any concerns about Sparks-Ross being in the unit. (*Id.*). Moses first learned that there may be an issue when Conner filed a grievance about Sparks-Ross being moved into the unit. (*Id.*). The grievance was assigned to Moses for investigation. (*Id.*). At that point, the two women were no longer housed in the same unit. (*Id.*). Additionally, Moses learned that there was no restriction against them being housed in the same unit. (*Id.*). Further, Conner acknowledged that she did not have any contact with Sparks-Ross during the ten-day period where they were both housed in Gladwin Unit. (*Id.*).

Bilesanmi was a prisoner counselor in October 2020. (ECF No. 31-6, PageID.505). She remembers Conner but cannot "recall specific discussions with her from over four years ago." (*Id.*). Bilesanmi also notes that she "did not have the authority to make prisoner housing unit moves." (*Id.* at PageID.505–06). If a prisoner had asked her about a move, Bilesanmi would have told a superior or told the prisoner to talk to a superior herself. (*Id.* at PageID.506).

9

### C. Summary Judgment Standard

A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Accordingly, a plaintiff's complaint shall be dismissed for failure to state a claim if it lacks sufficient "factual matter (taken as true) to" provide "plausible grounds to infer" that the elements of a claim for relief could be met. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007); *see* Fed. R. Civ. P. 12(b)(6). A complaint must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Mere labels, conclusory statements, or "formulaic recitations" of the elements of a cause of action are not sufficient to meet this burden if they are unsupported by adequate factual allegations. *Id.* (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). The requirement to provide a plausible claim does not require that a claim be "probable"; however, a claim must be more than merely "conceivable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–80 (2009).

### D. Analysis

Conner's remaining claims are for deliberate indifference and failure to protect. (*See* ECF No. 6, PageID.248).

"In the prison context, the Eighth Amendment imposes a duty on prison officials to take reasonable measures to guarantee the safety of the inmates." *Taylor v. Little*, 58 F. App'x 66, 67 (6th Cir. 2003) (citing *Farmer v. Brennan*, 511 U.S.

825, 832 (1994)). "To raise a cognizable constitutional claim for deliberate indifference to an inmate's safety, an inmate must make a two-part showing: (1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011). The first element is objective and the second is subjective. *See, e.g.*, *Price v. Ohio Dep't of Rehab. & Corr.*, 649 F. Supp. 3d 598, 605 (S.D. Ohio 2023) ("Eighth Amendment failure-to-protect claims have both an objective and subjective component.").

The second element concerns the prison official's subjective knowledge. Prison officials are forbidden "from acting with 'deliberate indifference' to the serious needs of prisoners." *Taylor*, 58 F. App'x at 67 (quoting *Walker v. Norris*, 917 F.2d 1449, 1453 (6th Cir. 1990)). "[D]eliberate indifference of a constitutional magnitude may occur when prison guards fail to protect one inmate from an attack by another." *Walker*, 917 F.2d at 1453.

However, "a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. "To prevail on a claim of deliberate indifference, a plaintiff must demonstrate that the defendant: (1) had actual knowledge of facts from which the inference could be drawn that a substantial risk of serious harm existed; and (2)

11

actually drew the inference." *Taylor*, 58 F. App'x at 67 (citing *Farmer*, 511 U.S. at 837). "[A] prison official who was unaware of a substantial risk of harm to an inmate may not be held liable under the Eighth Amendment even if the risk was obvious and a reasonable prison official would have noticed it." *Bishop*, 636 F.3d at 767.

### 1.     McLeod

Conner's claim against McLeod is for failure to protect her from being assaulted by Sparks-Ross.

To establish the objective element, Conner needs to show she was at a substantial risk of being assaulted by Sparks-Ross. *See Farmer*, 511 U.S. at 834; *see also Rose v. Cope*, No. 1:22-CV-891, 2025 WL 566319, at *8 (W.D. Mich. Jan. 22, 2025) ("Under Farmer, to establish an Eighth Amendment failure-to-protect claim, a plaintiff must establish that he reasonably fears an attack."), *report and recommendation adopted*, 2025 WL 563928 (W.D. Mich. Feb. 20, 2025).  She has not done so.

At most, Conner has shown that there were rumors about Sparks-Ross previously assaulting others and refusing to take her medication and that a different inmate could testify that Sparks-Ross was behaving erratically in the early hours of the morning on the day of the assault.  However, other courts have concluded that a plaintiff could not satisfy the objective element relying solely on "vague, unspecific verbal threats from [the attacker's] unidentified affiliates[,]" *Price v. Ohio Dep't of*

12

*Rehab. & Corr.*, 649 F. Supp. 3d 598, 607 (S.D. Ohio 2023), nor could a plaintiff satisfy the element when he expressed that he had "a general concern" of being attacked but did not identify "any particular gang members whom [he] feared" even when the inmate was eventually attacked, *Gant v. Campbell*, 4 F. App'x 254, 256 (6th Cir. 2001). Here, Conner appears to concede that the attack was random and unexpected. Therefore, she cannot establish that there was a substantial risk that Sparks-Ross would assault her as required to satisfy the objective element.

The strongest evidence for the first requirement of the subjective element is an inmate's account that shortly before the assault occurred, she told McLeod about Sparks-Ross' in-cell behavior. (ECF No. 31-4, PageID.486). But even if McLeod was told that Sparks-Ross was behaving erratically or angrily on the day of the assault, this alone is insufficient to demonstrate that "the inference could be drawn that a substantial risk of serious harm existed." *Id.* Conner herself testified that she did know Sparks-Ross, that Sparks-Ross had no reason to attack her, and that she did not anticipate Sparks-Ross' assault. (*Id.* at PageID.487–89).

There is no evidence that McLeod had any information suggesting that Sparks-Ross was dangerous beyond what she may have been told on the day of the assault and what she may have overheard when prisoners circulated rumors about Sparks-Ross. Given that there is evidence Conner had the same information as McLeod did before the assault, and that Conner felt the attack was random, Conner

13

cannot demonstrate that this information could lead to the inference that there was a substantial risk that Sparks-Ross would commit an unprovoked assault.

Moreover, even if McLeod "knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent," she would still not be liable. *Farmer*, 511 U.S. at 844. This is because McLeod needed to have *knowledge* of the risk for her to have violated the Eighth Amendment. *Id.* ("Because, however, prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware even of an obvious risk to inmate health or safety."). Further, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* It is evident from the video recording of the assault, and also appears to be undisputed, that McLeod responded reasonably to the assault. McLeod came running to stop the assault only seconds after it began.

Because Conner has not established the first element, she cannot establish the second. To do so, Conner needed to show that McLeod actually drew the inference that there was a substantial risk that Sparks-Ross would assault another inmate without provocation. Because Conner has not established that this is an inference that *could* be drawn, she axiomatically has not established that McLeod actually made the inference. Therefore, McLeod should be granted summary judgment. *See*

14

*Anderson v. Jones*, 440 F. Supp. 3d 819, 843 (S.D. Ohio 2020) (explaining that even though the plaintiff suffered traumatic injuries due to a prison attack, "the fact remains that neither corrections officers, nor those who hire and train them, are insurers of inmate safety in prison environments").

### 2. Moses and Bilesanmi

Conner's claims against Moses and Bilesanmi are for failure to protect her from being housed in the same unit as Sparks-Ross.

Defendants first argue that Conner cannot establish the objective element of her claim because she did not suffer any physical injury as a result of being housed with Sparks-Ross. While there are Sixth Circuit cases stating that a physical injury is required, there are also cases stating the opposite. *See Rose v. Cope*, 2025 WL 566319, at *8 (collecting cases). Given the lack of clarity from the Sixth Circuit on this issue, the Undersigned declines to recommend summary judgment on this ground.

Because Sparks-Ross had previously assaulted Conner, there is at least a genuine issue about whether Conner feared that Sparks-Ross would assault her again. Accordingly, the objective element is satisfied for the purposes of summary judgment.

The same is not true for the subjective element. Both Moses and Bilesanmi declared that they did not know about the assault. Conner has not presented any

15

evidence other than her testimony that they *should have known* and that she *assumed they knew*. This is insufficient to create a genuine issue of material fact on the subjective element. Simply put, Conner has not provided evidence establishing that Moses and Bilesanmi knew about the prior assault let alone that they knew about the assault and chose to ignore the risk that Sparks-Ross would assault Conner again. Because Conner has failed to establish the subjective element for her claims against Moses and Bilesanmi, they should be awarded summary judgment as well.

### E. Conclusion

For these reasons, **IT IS RECOMMENDED** that the Court **GRANT** Defendants' joint motion for summary judgment. (ECF No. 31). If adopted, the Court should **DENY** Conner's motion to overrule Defendants' objections and compel Defendants to respond **AS MOOT**. (ECF No. 35). Granting the motion for summary judgment would end this case.

## III. REVIEW

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right

of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this R&R. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this R&R to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: March 18, 2025　　　　　　　　　　s/ PATRICIA T. MORRIS
　　　　　　　　　　　　　　　　　　　Patricia T. Morris
　　　　　　　　　　　　　　　　　　　United States Magistrate Judge